Brewer et al. v. Keeler et al.

42    289
88    612

## BREWER ET AL. V. KEELER ET AL.

1. **ADVERSE POSSESSION:** *Tenants in common.*
   The possession of a part of tenants in common is the possession of all,
   and is not adverse to those not in actual possession until their rights
   are denied by some open, notorious and public act of those in possession
   amounting in law to an ouster.

2. **STATUTE OF LIMITATIONS:** *Tenants in common.*
   The filing of a bill for partition of the whole property between tenants
   in common in actual possession, ignoring the rights of a co-tenant not
   in possession, is such an open, public and notorious denial of his rights
   as amounts in law to an ouster, and sets in motion the statute of limita-
   tions against him.

3. **SAME:** *Staleness of claim.*
   Though there be no positive statute bar to a claim, it may yet be so stale
   that a court of equity will give it no support. [For the facts constitut-
   ing the staleness in this case see the opinion.—REP.]

4. **LANDLORD AND TENANT:** *Tenant buying outstanding title.*
   A tenant can not be relieved in any court from the payment of rent and
   restoration of the premises to his landlord, by buying up the out-
   standing title from another during his tenancy.

5. **FRAUD:** *May be waived.*
   Every case involving questions of fraud or good conscience must, to some
   extent, depend upon its own peculiar circumstances; and parties may,
   after a long time, be held to have waived the fraud after rights of
   others have been acquired, even with notice of it.

19

APPEAL from *Jefferson* Circuit Court, in Chancery.
Hon. X. J. PINDALL, Circuit Judge.

*N. T. White and McCain & Crawford* for appellants.

1.  When one purchases land at execution sale under an agreement with the debtor to hold the title until the money is repaid, a trust arises.  *19 Ark., 39; 20 Ib., 272; 31 Ib., 272.*

2.  If a trust, and the execution defendant remains in possession, third parties are affected with notice.  *33 Ark., 465.*

3.  Mere silence, when there is no obligation to speak, or acquiescence which induces no one to act, is not an estoppel.  *33 Ark., 465.*

4.  One who purchases at judicial sale an undivided interest in land of which he is already in possession, and who afterward makes partition and takes exclusive possession of that assigned to him, holds under the partition and not under the judicial sale, and the limitation is seven not five years.    As to limitation between co-tenants see *20 Ark., 375, 557; 31 Ib., 272.*

*Bell & Elliott* for appellee, submit:

1.  There was no trust in Walter P., as he distinctly says he bought for himself, with the intention of giving it back to *Bob*, if he needed and paid for it, but that he never paid for it.

2.  If there was a trust *Bob* is estopped to deny Keeler's title, having notice and stood by and permitted him to pay for it and make improvements for seven years without protest, and when the division was made carried the chain, etc., and admitted all the time that *Walt* had *dumfoozled* him out of his lands, etc.    Beside the statute of five years bars him from disturbing a *judicial* sale.

3.  Mattie Phelps' claim is *stale.*

EAKIN, J. This is a bill for partition and to quiet titles and enjoin the collection of rents with cross bills by different defendants setting up conflicting interests. The controversy regards lands which have been or now are held by members of the family and blood of Henry C. Bradford, long since deceased, although for the most part the rights of the parties are not rested upon any claim from heirs by descent. The titles have become complicated in a long course of years by trusts and conveyances, and intermarriages, and sales of undivided parts under mortgage and upon execution. The parties, as is usual in families, have dealt somewhat loosely with their several interests under a common occupation, and until a comparatively recent period, there has been no effort for partition.

This suit is brought by Brewer, who married one of the grand-daughters of Henry C. Bradford, and claims under a conveyance of an undivided interest from another of the grand-daughters.

The defendants are different surviving members of the family with others claiming under them by purchase or by marital right. Throughout it is a family controversy.

The lands will be better understood by this plat, made from the Government surveys, and from notes of a partition made several years ago under directions of the Chancery Court in another suit. Some of the lands have dropped out of the litigation.

The present contest is really concerning the northwest quarter of section thirty; lot two in the southwest quarter of nineteen, and the northeast of the northeast of twenty-five.

Brewer et al. v. Keeler et al.

5 S. OF 10 WEST.                    5 S. OF 9 WEST.

N. E. of 24

Has passed out of the suit.

Sec 24.

Mary F.

Lots 2,
N. W. ¼ 19.

Martha P.     Bob and Walter.     Keeler.

Lot 1,
N. W. ¼ 19.

Sec. 19.

Lot 2,
S. W. ¼ 19.

Martha
and
Mary F.

Bob
and
Walter.

Keeler.

Lot 1.
S. W. ¼ 19.

N. E. of N. E.
25.
Martha and Mary B.

Lot 2,
N. W. ¼ 30.

Martha
and
Mary  B.

Robert
and
Walter.

Keeler.

Lot 1,
N. W. ¼ 30

Ro't.T.
10
acres.

Sec. 30.

It is on all sides conceded that the northwest quarter of section 30, and lot 2, in the southwest quarter of 19, were, in 1849, the joint property of three of the children of Henry C. Bradford, to wit, William H., Robert T. and Mary F. Bradford, having undivided interests of one-third each. Upon the twentieth of March, of that year, William H. Bradford conveyed to his brother, Robert T., an undivided fourth interest in the southwest quarter of section 19, and the northwest quarter of section 30. With regard to lot 1, in the southwest quarter of section 19, this deed could take no effect, as it does not appear to have been owned by any of the parties. With regard to the other three lots in these fractional quarter sections it added a fourth interest to the third, which Robert T. already owned, giving him seven-twelfths, and leaving in William H. an interest of one-twelfth.

In the same year, on the twelfth of September, Mary F., who had intermarried with Taylor, and was then a widow, conveyed an undivided fourth interest in the same lands to her daughter, then an infant, Martha S. Taylor, known in the suit as Mattie Phelps. This would still leave in Mary F. an undivided one-twelfth. These conveyances are not attacked, and their result in 1849 was to leave the interests in the said portions of lands respectively as follows: Wm. H. Bradford, one twelfth; Mary F. Taylor, one-twelfth; Martha S. Taylor, three-twelfths; Robert T. Bradford, seven-twelfths.

Whilst this result must be accepted, I make no doubt that both William H. and Mary F. intended to convey all their interest. It was originally a fourth, but one of the owners, a sister, Sophia, had died, and they perhaps overlooked the increase of their individual proportions and conveyed according to their original conception of their interests. With regard to the northeast quarter of the

northeast quarter of section 25, the showing of title and ownership is not clear, save to this extent, that there is no legal title to it nor equitable right to it, shown originally in Brewer, the complainant. It also appears to have been considered a part of the joint property of the same three owners, William H., Mary F. and Robert T. Bradford, and has been treated in the dealings concerning the lands as part of the tract in which Robert T. had the seven-twelfths interest. The title can not be traced from the abstract used as evidence.

With regard to other portions of the land appearing in the plat, it is sufficient to say that they have been winnowed out of the litigation, and are no longer in controversy.

Previous to the sixth of April, 1868, a judgment was recovered by Carroll and Thompson against Robert T. Bradford, which had been levied upon his interest in said lands, and they were upon that day sold by the sheriff under execution. They were bought by his brother, I. Walt Bradford, who previously had no interest in them.

It is one of the questions in this case—indeed the most important one—whether or not I. Walt bought for his own use or whether he was clothed with a trust for the use of Robert T. Afterwards I. Walt mortgaged all the lands, or the interest he claimed under the purchase, to John Chaffe & Bro., of New Orleans. He became insolvent, and the lands were sold by a commissioner, under a decree of foreclosure, and conveyed to defendant, Keeler, by the commissioner, on the eighteenth day of May, 1873. The interest in the deed is described as two-fifths. At the time of the purchase and conveyance Keeler and Robert T. were jointly occupying and living together at the old Bradford homestead. Keeler, it is well to mention, had married the widow of William H. Bradford, who had died,

leaving two sons, the defendants, Robert and Walter Bradford. The widow herself has since died. Robert T. had not been made a party to the foreclosure suit, but knew of the mortgage before the foreclosure, and made no opposition to the sale.

After Keeler purchased, Robert T. removed to another part of the lands. The evidence shows that he considered himself as having been overreached in the transaction with I. Walt, but he set up no claim to the remaining title, and was disposed to accept the consequence as irremediable.

Afterwards there was a proceeding in chancery for a partition of the lands, in a case which appears in the partial record of it brought here, under the style of *George G. Keeler v. John F. Bradford*.

The suit was begun on the twenty-fifth day of November, 1873. After adjudication of the interests of parties, commissioners with directions were appointed on the twenty-fifth of February, 1874. In this case a partition by metes and bounds was made by the commissioners, and reported and confirmed on the twenty-eighth day of October, 1874.

The lands now in controversy, with some others, were divided into three portions and assigned, two-fifths to Keeler, two-fifths to Mary F. Bradford and Martha T. Bradford, the latter of whom was the mother of Mary F., and who claimed an interest, and one-fifth to Robert and Walter, the children of W. H., who were represented by a guardian. The several portions appear by the dotted lines in the plat.

It is not disclosed who the parties were to this partition. The decree is not formally pleaded by any of the parties to this suit, as an estoppel or *res judicata*, as to rights. It is mentioned in the pleadings as affecting possession, and seems to have been read in evidence, for that and other

purposes.   It was so used from the original record below, and is brought here by *certiorari*, that is the decree, as part of the evidence.   There is nothing to show that Robert T. or Martha S., the daugther of Mary F., to whom the mother had made a conveyance in 1849, were parties. Mary F., herself, was probably a party since her husband's name, John F. Bradford, is first in the style of defendants. She had married John F., after the conveyance to her daughter, Martha S., and after the death of her first husband, Taylor.   If Keeler represented all the interests that had been in Robert T., then one might fairly infer that all the parties who were originally joint owners were before the court.

Robert T., as remarked, does not appear to have been a party.   Evidently all the others, and he himself, believed that he had no remaining interests.   He did not apply to be made a party, and so far from protesting against that proceeding amongst his relations, he engaged in it actively, carrying the chain in surveying the tracts to be allotted. Whilst doing so, he remarked that he had been swindled out of his share, and seemed hurt and slightly aggrieved, but expressed the election to let it all go.   Afterwards, his sister, Mary F., carrying out the wishes of his mother-in-law, then dead, conveyed to him out of the portion allotted jointly to her mother and herself, and which her mother had conveyed all to herself, a ten acre tract for his own, which Robert F., accepted and took into possession.   This is shown on the extreme southern border of the plat. This conveyance was prompted solely, it seems, by sympathy with him in poverty, and to preserve him a home on the paternal acres.

We return now to Mary's daughter, Martha F. Taylor, to whom her mother, on the twelfth of September, 1849, had conveyed a fourth of the land as a gift.   There is

nothing to show that she was made a party to, or was represented in any of the subsequent suits, nor is there anything to show that she ever claimed anything under the deed, or attached any consequence to it, for a period of thirty years.

She was born in 1843, and by the laws then in force, became of age in 1864. She was several times married. First in 1860, to one Fisher, who died in the fall of 1864 or early in 1865. She then married a man named Reynolds, but when is not revealed. She lived awhile around Pine Bluff, and then removed to Little Rock, and afterwards was for awhile lost from sight. She was next heard of in New York. About the spring of 1878, she reappeared upon the old scene and was for a time the guest of Keeler.

She stated that she had been married to a man named Phelps. When her marriage relation with Reynolds ceased, by death or divorce, is not known.

In this condition of family affairs, after the death of Mary F., and while her last husband, John F. Bradford, was holding her share as tenant by courtesy, the complainant, T. C. Brewer, who had married the daughter of Robert T., rented in connection with another party, a portion of the lands for the year 1880. This was by written agreement between T. C. and W. C. Brewer, of one part, and John F. Bradford of another, containing express stipulations for payment of rent and redelivery at the end of the term.

The lessees entered into possession, and being thus in, the complainant, T. C. Brewer, and his father-in-law, R. T. Bradford, procured from Mattie S. Phelps, a conveyance of all her right, title and interest in the lands in controversy, specially describing northwest quarter of section 30; southwest quarter of section 19, and northeast

quarter of the northeast quarter of section 25 with others.

This deed bears date the nineteenth of May, 1880, and was acknowledged in New York, before a notary, on the fourteenth of June.

Thereupon T. C. Brewer, on the twenty-fifth of September, 1880, filed this bill against Keeler, Robert T. Bradford, the sons of William H. Bradford, deceased, whose widow. Keeler had married, and the husband and the children of Mary F., deceased, together with others, strangers to the family, who had, by tax sales and otherwise, obtained interests in the lands. Of these last it is enough to say, in passing, that their interests were all established, and the correctness of so much of the decree is conceded.

Brewer claimed half the lands, stating that defendants occupied with him as tenants in common. He admits the contract of lease, but says it was made to him by fraud of John F. Bradford, in representing himself as the owner entitled to make it, and sets up his own purchase of a half interest since the lease. He prays partition, injunction of rents and a receiver.

Keeler denied any interest in complainant; sets up his own interest as all of that which belonged to Robert T. before the sale by the commissioner; pleaded the statutes of limitations of five and seven years and makes his answer a cross bill against his co-defendants for partition.

Robert and Walter T. Bradford, sons of William H., claim under their father some fragments of interest in the disputed tracts, or which they set up without any reference to the former partition, and pray to be allowed them on a new partition. Their claims do not materially clash with Keeler's.

John F. Bradford claims under his wife, without any reference to her deed in 1849, whilst Mrs. Taylor, to her daughter, Martha S.

He rests upon the partition of 1874, without pleading it specially. As to the rents under the lease made by him to Brewer, he consents to a receiver.

Robert T. Bradford relies upon his interests, original and acquired, as set forth in the beginning of this opinion, and contends that his brother, I. Walt, bought in trust for him, that he had repaid his brother, and that Chaffe & Bros. had notice by his possession, as did Keeler when he purchased on foreclosure. He says that Keeler was in when he bought; did not take possession by virtue of the purchase, and that he has received rents and profits ample for reimbursement. He relies a'so on the deed of Mattie S. to himself and Brewer of the nineteenth of May.

In a reply to Keeler's cross bill, Brewer denies that the purchase of Robert T.'s interest was such as to remove the trust which had attached, as he contends, in the hands of I. Walt. He shows that Mary F. died intestate in 1877, leaving two daughters, Mattie S. and Mrs. Newson.

Upon hearing the Chancellor found:

First—That the cross bill of John F. Bradford, G. G. Keeler and the sons of Wm. H. Bradford showed no cause why the former decree of partition should be set aside, and dismissed them accordingly.

Second—That there was no equity in complainant's bill, which was also dismissed.

Third—The same finding and decree as to the cross bill of Robert T. Bradford.

In short, none of the litigants took anything in the suit. The costs were adjudged against the complainants, and Brewer was ordered to restore to John F. Bradford the lands in the lease.

This appeal is taken alone by complainant, Brewer, and the defendant, Robert T. Bradford, who rely upon some points in common, and whose interests do not materially

Brewer et al. v. Keeler et al.

conflict. Only questions touching them will be considered.

The first point decided as above set forth is not of that nature. Did Brewer show any equity? He claims solely by deed of Martha S. Phelps of the nineteenth of May, 1880. That could convey no interest inherited from the mother, Mary F., in opposition to the partition to which her mother was a party, nor any in accordance with it as to her mother's share, which she could now assert, since John F. Bradford, her mother's second husband, had issue born alive, Mrs. Newson. If the deed conveyed anything to Brewer and Robert T., it could come only through the interest vested in Martha S. by her mother's deed of 1849, whatever that might be.

1. ADVERSE POSSESSION: Tenants in common

Taking that old deed as good to transfer the title as a gift when executed, we can not see that either Martha S. or her vendees, at the beginning of the suit, were barred, strictly at law, by the statute of limitation. Her infancy had long ripened, it is true, into mature womanhood; but the possession of her uncles and her mother of the undivided lands, was her possession. It remained so until they made application for a partition of the whole property amongst themselves, ignoring her rights, and in opposition to them. This was an open, notorious and public denial of them, which amounted in law to such ouster as would set the statute running. The ouster of a tenant in common need not be by violent or intimidating expulsion or repulsion. It must only be notorious and decisive of intention. See cases in *Angell on Limitation*, section 429.

2. STATUTE OF LIMITATIONS. Tenants in common: Ouster by filing bills, etc.

We do not know what were the allegations of the complaint in the old suit as to the rights of Martha S. But when the commissioners were appointed in February, 1874, to make division, with directions to partition the whole amongst the parties before the court without any saving as

to her, or recognition of her claim, it is clear that an open, notorious and public claim to exclude her, was thereby made by all the parties. This was more than seven years before the commencement of the suit.

Next arises the question, was she then under any disability, was she a married woman then? If then discovert no subsequent marriage. could stop the statute. If then covert her right to sue would survive that coverture three years.

Her first husband, Fisher, was dead. Her second husband, Reynolds, had died also some time before 1878, for then she appears as the wife of Phelps. Taking that as true, it can not be known from the evidence when she married Reynolds, or when the marital relation between them ended. The proof tends to show that she married Reynolds before the adverse claim of her co-tenants was set up in the partition. Starting with that fact, the presumption would be, that her status of coverture continued until either its termination be shown, or the presumption of continuance be met and overcome by a counter presumption arising from time and the course of nature. The first presumption would carry her disability to a period within three years before the commencement of this suit.

Yet, although there appears no positive statute bar, the claim is not only suspicious, but stale to an extraordinary degree. It was a mere gift at first, made to her when a child of six or seven years. She grew to womanhood, was several times married, and again discovert, and was nearly forty before she seems to have asserted any claim to the property, whatever,· or to the rents or profits, or any participation in the possession. Meanwhile all but one of her co-tenants had passed away, and others had succeeded to and enjoyed their rights, and dealt with the property as

2. SAME: Staleness of claim.

their own.   Women are not apt to be so careless of their income, nor would three successive husbands be so careless of their marital rights if they had ever supposed they had any.   A war had intervened in which many muniments of title had been lost or destroyed, and all the persons were dead who would have been apt to know of any retrocession of her claims to her mother, after she became competent to act.   There is nothing in the case to appeal to the feelings of humanity or sympathy, in support of her title so asserted at so late a period.   There would be a sense of injustice in now allowing it if asserted in good faith by herself.   The repugnance to do so is increased by the object for which it is now revived and invoked.   To enable a tenant to defeat the title of his landlord, and attach to his landlord the stigma of fraud in making the lease.

I have never, in all my experience or reading, met with a case which more forcibly illustrates the wisdom of the doctrine of staleness, or a more fitting one for its application.

There is another consideration, also, which must not be overlooked.   The immediate object of the bill is to enjoin the collection of rents, and to avoid the express written obligation of the tenant to return the premises.   The rule is settled with some plain exceptions, not including this case, that a tenant can not be heard in any court, who asks absolution from his duties as tenant, from having got in the outstanding title to the land from another.   It is a breach of the fealty which the relation implies.   We do not mean to lend any encouragement to the idea that Brewer may pay the rent, and return the possession, and then assert rights of this nature acquired during the tenancy.   Whatever may be the general rule on this point, he has not offered to do so, but has, even in the most favorable view, brought this suit prematurely.   We do not rest our opinion, however, on this point alone.   The objection

goes deeper. The claim is too stale for notice in a court of equity. The complaint was properly dismissed with all the costs of the suit.

As to so much of R. T. Bradford's cross-bill as rests upon this same deed of Martha S. Phelps, the same remarks apply. The portion of it which seeks to charge Keeler with a trust, demands graver attention, and may not be so easily decided upon the facts. He was poor and embarrassed. There is some reason to believe he left the management of his land matters to his brother, who was a man of substance and trusted by the family. He asked his brother to buy the land and hold it for him. His brother did so for a small amount, and Robert sent him a mule which he accepted, and which probably covered the amount his brother paid. I. Walt denies this to the extent alleged, but admits enough to raise a strong suspicion that he at least allowed Robert T. to remain under the impression that he was holding the land for him. Robert T. was in possession when the mortgage was executed to Chaffe & Bro., and remained so until after foreclosure. The proof of a trust would, I think, preponderate if this were all.

But after he was informed of the mortgage, about seven years before this suit, and up to the date of his cross bill, he never repudiated the transaction, nor claimed the property, or any part of it, as his own. He murmured at the loss, but treated it as lost. When Keeler purchased from the commissioners Robert T. acquiesced and ceased to reside upon it. He made no protest. He actually assisted in the subsequent partition, which allotted the share to Keeler, which Keeler claimed under the purchase. He afterwards accepted from his mother and sister a portion of the old home tract which had been allotted to them, and which they gave and he accepted upon the grounds that

6. FRAUD: May be waived by acts, etc.

he had lost all his interest otherwise, and that it was necessary to preserve for him a home with his kindred, amidst old scenes and associations. This was evidently the spirit and meaning of the transaction, and it was creditable to human nature.

He could not "*ex equo et bono*" enjoy this tribute of maternal and sisterly love, and reclaim from another brother, or his vendee, the same property, the loss of which had prompted the gift. We do not say he would be bound to refrain from this if palpable fraud had been practiced by his brother, for the facts do not make a case of election. Yet it is a fact which the Chancellor might well take into consideration, together with the conflicting evidence as to the original fraud, and his long and repeated acts of acquiescence.

Every case involving questions of fraud or good conscience must, to some extent, depend upon its peculiar circumstances, and parties may, after a long time, be held to have waived it after rights of others have been acquired even with notice.

We think the Chancellor acted within the limits of a sound legal discretion in refusing to entertain this cross bill. Undoubtedly the Bradford family have dealt loosely with each other, and there are fragments of interest which might in apt time have been picked up, saved and adjusted.

But to go back now through and past the period of the civil war, and re-state their several interests and to endeavor to adjust them with rigid accuracy, might lead to greater injustice than any which may have been unwittingly done by the old partition.

It has something of the nature of and is governed by similar considerations applied to family settlements.

It had better stand.

Affirmed.